No. 24-3200

---

**UNITED STATES COURT OF APPEALS FOR THE EIGHTH CIRCUIT**

---

MOREHOUSE ENTERPRISES, LLC D/B/A BRIDGE CITY ORDNANCE; GUN OWNERS OF AMERICA, INC.; GUN OWNERS FOUNDATION,
*Plaintiffs-Appellants,*

v.

BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES; UNITED STATES DEPARTMENT OF JUSTICE; STEVEN M. DETTELBACH, IN HIS OFFICIAL CAPACITY AS THE DIRECTOR OF ATF; HANS HUMMEL, IN HIS OFFICIAL CAPACITY AS THE DIRECTOR OF INDUSTRY OPERATIONS FOR THE SAINT PAUL FIELD DIVISION OF THE ATF,
*Defendants-Appellees,*

---

On Appeal from the U.S. District Court for the District of North Dakota, No. 3:23-cv-00129,
The Honorable Peter D. Welte, U.S. District Judge

---

# BRIEF OF AMICI CURIAE BRADY CENTER TO PREVENT GUN VIOLENCE, EVERYTOWN FOR GUN SAFETY SUPPORT FUND, MARCH FOR OUR LIVES FOUNDATION, AND GIFFORDS LAW CENTER TO PREVENT GUN VIOLENCE IN SUPPORT OF APPELLEES AND AFFIRMANCE

---


Scott L. Winkelman
Tiana L. Russell
Julia Carbonetti
CROWELL & MORING LLP
1001 Pennsylvania Ave., N.W.
Washington, D.C. 20004-2595
Phone: (202) 624-2500
swinkelman@crowell.com
trussell@crowell.com
jcarbonetti@crowell.com

Luke Taeschler
Suzanne Giammalva
CROWELL & MORING LLP
375 Ninth Ave
New York, NY 10001
Phone: (212) 223-4000
ltaeschler@crowell.com
sgiammalva@crowell.com

## CORPORATE DISCLOSURE STATEMENT

*Amici* Brady Center to Prevent Gun Violence ("Brady"), Everytown for Gun Safety Support Fund ("Everytown"), March For Our Lives Foundation ("MFOL"), and Giffords Law Center to Prevent Gun Violence ("Giffords Law Center") state that they are nonprofit corporations with no parent corporations. *Amici* do not issue stock and therefore no publicly held corporation owns 10% or more of their stock.

## TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT .......... i

INTEREST OF *AMICI CURIAE* AND CONSENT TO FILE .......... 1

INTRODUCTION AND SUMMARY OF ARGUMENT .......... 4

ARGUMENT .......... 10

I. ATF's Compliance Inspection Program Is Integral to Public Safety .......... 10

- A. The Importance of Background Checks to Public Safety .......... 12
- B. The Importance of Record-Keeping to Public Safety .......... 14

II. ATF's Enhanced Regulatory Enforcement Policy Aligns with the GCA and Applies Only to the Most Serious and Willful Violations .......... 16

III. The Data Demonstrate the Enhanced Regulatory Enforcement Policy's Modest Yet Important Nature .......... 19

IV. Federal Firearm Licensees Enjoy Special Protections to Challenge a Potential Revocation .......... 21

CONCLUSION .......... 24

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abramski v. U.S.*,
573 U.S. 169 (2014) .................................................... 4, 6, 7, 13, 14, 24

*Barrett v. U.S.*,
423 U.S. 212 (1976) .................................................... 12

*City of Syracuse v. ATF*,
No. 20-cv-06885 (S.D.N.Y. 2020) .................................................... 3

*Dick's Sport Ctr., Inc. v. Alexander*,
2006 WL 799178 (E.D. Mich. Mar. 29, 2006) .................................................... 16

*District of Columbia v. Helle*r,
554 U.S. 570 (2008) .................................................... 2, 13

*Everytown for Gun Safety Support Fund v. ATF*,
No. 21-cv-00376 (S.D.N.Y. 2021) .................................................... 3

*Fin & Feather Sport Shop, Inc. v. U.S. Treasury Dep't.*,
481 F. Supp. 800 (D. Neb. 1979) .................................................... 15, 16

*Hanson v. District of Columbia*,
2023 WL 3019777 (D.D.C. Apr. 20, 2023) .................................................... 2

*Huddleston v. United States*,
415 U.S. 814 (1974) .................................................... 10, 12, 15, 19

*J & G Sales Ltd. v. Truscott*,
473 F.3d 1043 (9th Cir. 2007) .................................................... 15

*Lewin v. Blumenthal*,
590 F.2d 268 (8th Cir. 1979) .................................................... 22

*Morehouse Enterprises, LLC v. ATF*,
Nos. 22-2812, 22-2854 (8th Cir. Dec. 5, 2022) .................................................... 2, 3

*Morehouse Enterprises, LLC v. Bureau of Alcohol, Tobacco, Firearms & Explosives*,
2024 WL 5063388 (D.N.D. Oct. 8, 2024) .............................................. 9

*Morehouse Enterprises, LLC v. Bureau of Alcohol, Tobacco, Firearms and Explosives*,
2024 WL 708954 (D.N.D. Jan. 2, 2024) .............................................. 24

*National Ass'n for Gun Rights, Inc. v. City of San Jose*,
2023 U.S. Dist. LEXIS 120797 (N.D. Cal. July 13, 2023) .................... 2

*New York State Rifle & Pistol Ass'n v. Bruen*,
597 U.S. 1 (2022) .............................................................. 2, 13

*On Target Sporting Goods, Inc. v. Att'y Gen. of U.S.*,
472 F.3d 572 (8th Cir. 2007) .............................................. 22

*United States v. Hayes*,
555 U.S. 415 (2009) .............................................................. 2

*United States v. Missouri*,
No. 23-1457 (8th Cir. Aug. 17, 2023) .................................... 2

*United States v. Mobley*,
956 F.2d 450 (3d Cir. 1992) ................................................ 15

*United States v. Rahimi*,
602 U.S. 680 (2024) .............................................................. 13

**Statutes**

18 U.S.C. § 922 .............................................................. 11

18 U.S.C. § 922(a)(1)(A) .................................................. 11

18 U.S.C. § 922(a)(6) ........................................................ 13

18 U.S.C. § 922(b) ............................................................ 11

18 U.S.C. § 922(d) ............................................................ 11

18 U.S.C. § 922(m) ............................................................ 13

18 U.S.C. § 922(n) .......... 11

18 U.S.C. § 922(t) .......... 13

18 U.S.C. § 922(t)(1) .......... 12, 17

18 U.S.C. § 922(t)(1)(A)–(B) .......... 6

18 U.S.C. § 923(a) .......... 11

18 U.S.C. § 923(e) .......... 11, 21, 22

18 U.S.C. § 923(f)(2) .......... 22

18 U.S.C. § 923(f)(3) .......... 22, 23, 24

18 U.S.C. § 923(g) .......... 6, 22

18 U.S.C. § 923(g)(1)(A) .......... 14

18 U.S.C. § 923(g)(1)(B) .......... 14

18 U.S.C. § 923(g)(3) .......... 11

18 U.S.C. § 924 .......... 11

18 U.S.C. § 924(a)(3) .......... 13

**Regulations**

27 C.F.R. § 478.73 .......... 11, 22

27 C.F.R. §§ 478.73–74 .......... 21, 22

27 C.F.R. § 478.74 .......... 9, 22

27 C.F.R. § 478.78 .......... 23

27 C.F.R. § 478.99 .......... 11

27 C.F.R. § 478.101 .......... 11

27 C.F.R. § 478.102(a) .......... 12

27 C.F.R. §§ 478.121–134 .......... 14

27 C.F.R. § 478.121(b) .......... 14

27 C.F.R. § 478.124 .......... 6

28 C.F.R. § 0.130(a) .......... 5

**Rules**

Fed. R. App. P. 29(a) .......... 1

Fed. R. App. P. 29(a)(2) .......... 1

**U.S. Constitution**

U.S. CONST. art. III, § 3 .......... 9

U.S. CONST. pmbl. .......... 4

**Other Authorities**

Annette Choi, *Children and teens are more likely to die by guns than anything else*, CNN (Sept. 7, 2024) .......... 5

*Attorney General Merrick B. Garland Delivers Remarks on the Biden Administration's Gun Crime Prevention Strategy*, U.S. DEP'T. OF JUST. (June 23, 2021) .......... 16

Connor Brooks, *Background Checks for Firearm Transfers*, 2019-2020, U.S. Bureau of Just. Statistics (Nov. 2023) .......... 5

*Fact Sheet - Facts and Figures for Fiscal Year 2023*, ATF: Bureau of Alcohol, Tobacco, Firearms & Explosives (July 2024) .......... 19

*Fact Sheet: Biden-Harris Administration Announces Comprehensive Strategy to Prevent and Respond to Gun Crime and Ensure Public Safety*, THE WHITE HOUSE (June 23, 2021) .......... 7

*Fact Sheet: Biden-Harris Administration Announces Comprehensive Strategy to Prevent and Respond to Gun Crime and Ensure Public Safety*, THE WHITE HOUSE (June 23, 2021) .......... 16

THE FEDERALIST No. 15 (Hamilton) .......... 9

*Final Notice of Denial of Application, Revocation, Suspension and/or Fine of Firearms License for Licensee Blue Valley Sales, Inc. d/b/a Blue Valley Firearms,* ATF, (Feb. 3, 2022) .......... 20

*Final Notice of Denial of Application, Revocation, Suspension and/or Fine of Firearms License for Licensee Blue Water Sales, LLC* (July 27, 2022) .......... 21

*Final Notice of Denial of Application, Revocation, Suspension and/or Fine of Firearms License for Licensee Charles G. Brown*, ATF Bureau of Alcohol, Tobacco, Firearms & Explosives (July 21, 2022) .......... 20

*Final Notice of Denial of Application, Revocation, Suspension and/or Fine of Firearms License for Licensee Gary William Gibbs d/b/a The Gun Shop,* ATF (May 20, 2022) .......... 21

*Final Notice of Denial of Application, Revocation, Suspension and/or Fine of Firearms License for Licensee Harrison's Inc. d/b/a LaVergne Pawn and Jewelry*, ATF (July 21, 2022) .......... 21

*Firearms Licenses*, ATF: BUREAU OF ALCOHOL, TOBACCO, FIREARMS & EXPLOSIVES, https://www.atf.gov/firearms/revocation-firearms-licenses (last visited Jan. 19, 2025) .......... 23

*Gun Violence Archive 2023*, https://www.gunviolencearchive.org/ (last visited Jan. 17, 2025) .......... 5

H. Rep. No. 90-1577 (1968) .......... 10

*Part III: Crime Guns Recovered and Traced Within the United States and Its Territories*, ATF: BUREAU OF ALCOHOL, TOBACCO, FIREARMS & EXPLOSIVES (March 27, 2024) .......... 15

*Review of ATF's Federal Firearms License Inspection Program* (April 2013) .......... 19

S. Rep. No. 90-1501 (1968) .......... 10

S. Rep. No. 90-1501 (1968) .......... 19

## INTEREST OF *AMICI CURIAE* AND CONSENT TO FILE

*Amici curiae* Brady Center to Prevent Gun Violence ("Brady"), Everytown for Gun Safety Support Fund, Giffords Law Center to Prevent Gun Violence ("Giffords Law Center"), and March For Our Lives Foundation ("MFOL") submit this brief pursuant to Fed. R. App. P. 29(a)(2).[1]

Brady is the nation's oldest nonpartisan, nonprofit organization dedicated to reducing gun violence through education, research, and legal advocacy. Brady works to free America from gun violence by passing and defending gun violence prevention laws, reforming the gun industry, and educating the public about responsible gun ownership. Brady has a substantial interest in ensuring that the Constitution is construed to protect Americans' fundamental right to live. Brady has filed *amicus*

---

[1] Pursuant to Federal Rule of Appellate Procedure 29(a), *amici* certify that (1) all parties consented to the filing of this brief, (2) no party's counsel authored the brief in whole or in part, (3) no party or party's counsel contributed money that was intended to fund preparing or submitting the brief, and (4) no person other than amici contributed money that was intended to fund preparing or submitting this brief.

briefs in many cases involving the regulation of firearms, including in this Court.[2]

Everytown for Gun Safety Support Fund ("Everytown") is the education, research, and litigation arm of Everytown for Gun Safety, the country's largest gun-violence prevention organization, with millions of supporters nationwide. Everytown seeks to improve public understanding of the causes of gun violence and to help reduce that violence by conducting groundbreaking original research, developing evidence-based policies, communicating this knowledge to the American public, and advancing gun safety and gun violence prevention in communities and the courts. Everytown has extensive experience litigating cases involving the interpretation of federal firearms laws and

---

[2] *See, e.g., United States v. Missouri*, No. 23-1457 (8th Cir. Aug. 17, 2023); *Morehouse Enterprises, LLC v. ATF*, Nos. 22-2812, 22-2854 (8th Cir. Dec. 5, 2022); *see also New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022); *District of Columbia v. Helle*r, 554 U.S. 570 (2008). Court decisions have cited Brady's research and expertise on these issues. *See, e.g., United States v. Hayes*, 555 U.S. 415 (2009); *National Ass'n for Gun Rights, Inc. v. City of San Jose*, 2023 U.S. Dist. LEXIS 120797, at *14-15, *18-19 (N.D. Cal. July 13, 2023); *Hanson v. District of Columbia*, 2023 WL 3019777, at *10, *14, *16 & nn.8, 10 (D.D.C. Apr. 20, 2023).

has submitted numerous amicus briefs in cases involving challenges to federal firearms laws and regulations.[3]

Giffords Law Center is a non-profit policy organization serving lawmakers, advocates, legal professionals, gun violence survivors, gun owners, and others who seek to reduce gun violence and improve the safety of their communities. The organization was founded thirty years ago following a massacre at a San Francisco law firm and was renamed Giffords Law Center in 2017 after joining forces with the gun-safety organization led by former Congresswoman Gabrielle Giffords. Through partnerships with gun violence researchers, public health experts, and community organizations, Giffords Law Center researchers, drafts, and defends the laws, policies, and programs proven to effectively reduce gun violence. Together with its partner organization, Giffords Law Center also advocates for the interests of gun owners and law enforcement officials who understand that Second Amendment rights have always

---

[3] *See, e.g.,* Amicus Br., *Morehouse Enterprises, LLC v. ATF*, Nos. 22-2812, 22-2854 (8th Cir. Dec. 5, 2022) (amicus brief in support of ATF rulemaking). *Everytown for Gun Safety Support Fund v. ATF*, 21-cv-00376 (S.D.N.Y. 2021) (challenge to ATF action); *City of Syracuse v. ATF*, No. 20-cv-06885 (S.D.N.Y. 2020) (challenge to ATF actions).

been consistent with gun safety legislation and community violence prevention strategies.

MFOL is a youth-led non-profit organization seeking to promote civic engagement, education, and direct action in support of sensible gun regulations that protect communities and save lives. MFOL arose in the wake of the 2018 mass shooting at Marjory Stoneman Douglas High School in Parkland, Florida. It immediately organized the largest single day of protest against gun violence in the nation's history. MFOL has since established itself as one of the foremost authorities at the intersection of youth-led activism and advocacy to prevent gun violence.

## INTRODUCTION AND SUMMARY OF ARGUMENT

For over 50 years, federal law has "regulated sales by licensed firearms dealers, principally to prevent guns from falling into the wrong hands." *Abramski v. U.S.*, 573 U.S. 169, 172 (2014). These laws serve the vital Constitutional purpose of "insur[ing] domestic Tranquility" and "[p]romot[ing] the general welfare." U.S. CONST. pmbl. While firearms have lawful uses, they also cause staggering individual and societal harm. Last year alone, there were over 500 mass shootings in the United States. *Past Summary Ledgers,* Gun Violence Archive,

https://www.gunviolencearchive.org/past-tolls (last updated Jan. 19, 2025). Tragically, firearms have become the leading cause of death for children and teens nationally.[4]

Without the Gun Control Act of 1968 ("GCA")—the enforcement of which the Attorney General has vested in the Bureau of Alcohol, Tobacco, Firearms and Explosives[5] ("ATF")—these facts would be grimmer still. The GCA helps keep Americans safer by reducing the illegal purchase and use of firearms by persons who intend to use them to inflict harm. Since 1994, when the Brady Handgun Violence Prevention Act went into effect, through 2020, about 4.4 million applications for gun sales were legally blocked due to failed background checks, keeping guns away from those most likely to misuse them.[6]

---

[4] *Issues: Children and Teens*, Everytown Research & Policy, https://everytownresearch.org/issue/child-and-teens (last updated Nov. 7, 2024); *Gun Violence Archive 2023*, https://www.gunviolencearchive.org/ (last visited Jan. 17, 2025); Annette Choi, *Children and teens are more likely to die by guns than anything else*, CNN (Sept. 7, 2024, 10:30AM), https://www.cnn.com/2023/03/29/health/us-children-gun-deaths-dg/index.html.

[5] *See* 28 C.F.R. § 0.130(a).

[6] *See, e.g.,* Connor Brooks, *Background Checks for Firearm Transfers*, 2019-2020, U.S. Bureau of Just. Statistics (Nov. 2023), https://bjs.ojp.gov/document/bcft1920.pdf.

The GCA "is Congress's primary means of regulating the interstate commerce in firearms." App. 33; R. Doc. 1, at 5, ¶ 19. To protect the public welfare, the GCA "establishes a detailed scheme to enable the [licensed firearms] dealer to verify, at the point of sale, whether a potential buyer may lawfully own a gun." *Abramski*, 573 U.S. at 172. It does so by requiring federal firearms licensees ("FFLs") "to check and make use of certain identifying information received from the buyer" and, before completing any sale, to submit the prospective buyer's identifying information to the National Instant Background Check System "to determine whether the potential purchaser is for any reason disqualified from owning a firearm." *Id.* at 172–73 (citing 18 U.S.C. § 922(t)(1)(A)–(B)). In tandem, FFLs are to memorialize these critical requirements and their firearm transactions in certain records and forms. 18 U.S.C. § 923(g); 27 C.F.R. § 478.124.

These conduct and record-keeping requirements are no mere bureaucratic red tape. Congress looks to FFLs as the first line of defense when it comes to gun safety, and these regulatory measures are essential in ensuring that guns do not fall into the wrong hands. They are also crucial to crime-solving. FFL records allow ATF to trace crime guns

recovered by law enforcement agencies to the guns' first retail sale, which can develop investigative leads; dealers who fail to accurately record their firearm transactions, or who fail to provide timely responses to enable tracing, hamper this essential law enforcement tool. The GCA's conduct and record-keeping requirements are critical in "keep[ing] guns out of the hands of criminals and others who should not have them, and . . . assist[ing] law enforcement authorities in investigating serious crimes." *Abramski,* 573 U.S. at 180.

In June 2021, a federal "Comprehensive Strategy to Prevent and Respond to Gun Crime and Ensure Public Safety" was announced, which, among other goals, sought to hold rogue firearm dealers to account for willfully flouting federal firearm laws.[7] In January 2022, to effectuate this policy, the DOJ issued ATF Order 5370.1E, the Federal Firearms Administrative Action Policy and Procedures, which provided "fair and consistent guidelines for administrative remedies for violations." App.

---

[7] *Fact Sheet: Biden-Harris Administration Announces Comprehensive Strategy to Prevent and Respond to Gun Crime and Ensure Public Safety*, THE WHITE HOUSE (June 23, 2021), https://www.whitehouse.gov/briefing-room/statements-releases/2021/06/23/fact-sheet-biden-harris-administration-announces-comprehensive-strategy-to-prevent-and-respond-to-gun-crime-and-ensure-public-safety/.

104; R. Doc. 1-3, at 1. In January 2023, ATF issued Order 5370.1F with its updated this Administrative Action Policy and Procedures internal guidance ("AAP").[8] The AAP singles out the following five types of egregious violations of federal firearms law for "assumed" license revocation when found to be done willfully: 1) transferring a firearm to a prohibited person, 2) failing to run a required background check, 3) falsifying records such as a firearms transaction form, 4) failing to respond to an ATF trace request, and 5) refusing to permit ATF to conduct an inspection. App. 381; R. Doc. 34-1, at 3.

Even where revocation is assumed, ATF officials can, and do, still exercise discretion, and the AAP leaves unmistakable that various circumstances can obviate this sanction.[9] Affected parties may also

[8] As Plaintiffs-Appellants concede, Order 5370.1F "contains subtle changes from version 53701.E that are not relevant here[.]" Plaintiffs-Appellants' Br. at 9, n. 4. The district court below considered this updated ATF Order 5370.1F in granting the Defendants-Appellee's motion to dismiss. App. 436; R. Doc 49, at 4 n. 1. Accordingly, all references to the AAP in this brief refer to ATF Order 5370.1F. After the district court's order in August 2024, the ATF updated this internal guidance issuing ATF Order 5370.1G, which the DOJ states is "substantively consistent" with ATF Order 5370.1F. Defendants-Appellee's Br. at 5, n. 1.

[9] ATF Order 5370.1F(7)(e)(6); (7)(h). App. 385-86, 388, R. Doc. 34-1 at 7-8, 10.

contest revocation pursuant to 27 C.F.R. § 478.74. FFLs enjoy unusually robust process between receiving notice of ATF's intention to revoke a license and that revocation becoming final and effective.

The Constitution provides that the President of the United States "shall take Care that the Laws be faithfully executed . . . ." U.S. CONST. art. III, § 3. Sanctions are one important tool to ensure a law is "faithfully executed." The founding fathers agreed: "Government implies the power of making laws. It is essential to the idea of a law, that it be attended with a sanction; or, in other words, a penalty or punishment for disobedience." THE FEDERALIST No. 15 (Hamilton). The Executive Branch "took care" when issuing the AAP, and ATF "takes care" when it enforces the AAP.

Here, Plaintiffs-Appellants challenge a wholly routine and lawful scenario: the federal government issued the AAP, a regulatory enforcement policy through which ATF implements its revocation authority under the GCA. The AAP "does not alter legal rights or responsibilities," as the district court below correctly concluded. *Morehouse Enterprises, LLC v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 2024 WL 5063388, at *6 (D.N.D. Oct. 8, 2024). By prioritizing

revocation for those violations that pose the greatest threat to public safety, the AAP's intent and effect is to ensure public safety.

This Court should affirm the district court's order granting Defendants-Appellees' motion to dismiss.

## ARGUMENT

### I. ATF's Compliance Inspection Program Is Integral to Public Safety

The GCA has two principal goals: to promote public safety by keeping guns out of the hands of persons prohibited from owning them, and to assist law enforcement in fighting crime.[10] The GCA furthers these goals by regulating who may buy or sell firearms and how firearm transactions are documented and tracked.

The GCA designates FFLs—those who manufacture, sell, or import firearms—as the "principal agent of [law] enforcement" in "restricting . . . access to firearms." *Huddleston v. United States*, 415 U.S. 814, 824 (1974). Under the GCA, FFLs—and only FFLs—may

[10] S. Rep. No. 90-1501, at 22 (1968) ("Senate Report") ("The principal purposes of this act are to make it possible to keep firearms out of the hands of those not legally entitled to possess them . . . and to assist law enforcement . . . in combating . . . crime."); H. Rep. No. 90-1577, at 4412 (1968) (explaining the "need" to combat "the growing use of firearms in violent crime").

"engage in the business of importing, manufacturing, or dealing in firearms." 18 U.S.C. § 922(a)(1)(A); *see id*. § 923(a). In exchange, FFLs serve as the GCA's frontline mechanism for implementation and must comply with critical safeguards:

- FFLs may not "sell or deliver" firearms to individuals who, *inter alia*, are underage, reside out of state (with limited exceptions), or have certain criminal histories. 18 U.S.C. §§ 922(b), 922(d), 922(n); *see* 27 C.F.R. § 478.99.
- FFLs must keep inventory and transaction records and report suspicious purchasing patterns. 27 C.F.R. § 478.101 (record-keeping), 478.121–134 (same); 18 U.S.C. § 923(g)(3) (FFLs must report when an individual buys multiple handguns within a short timeframe).
- FFLs must make their records accessible to law enforcement officials, who may access them to monitor, investigate, and combat firearm-related crimes. *See id.*

FFLs who fail to comply with these or other duties may lose their license (18 U.S.C. § 923(e); 27 C.F.R. § 478.73) and become subject to civil and criminal liability. 18 U.S.C. §§ 922, 924. These sanctions are commensurate with the seriousness of the infractions, as failing to properly conduct background checks, falsifying records, or selling firearms across state lines undermines public safety by allowing dangerous and prohibited persons to obtain firearms and makes it difficult if not impossible to trace firearms recovered in crimes.

The centrality of the GCA's focus on the point of sale cannot be overestimated. In essence, the GCA and its implementing regulations anoint FFLs as gatekeepers—"principal agents" in the Supreme Court's parlance—who facilitate the law-abiding use of firearms, and the Act reinforces the importance of their front-line role by specifying sanctions for noncompliance. *Huddleston*, 415 U.S. at 824.

### A. The Importance of Background Checks to Public Safety

Background checks are foundational to keeping firearms out of the hands of dangerous individuals. To that end, the GCA requires that individuals who purchase a firearm from an FFL submit to a background check. 18 U.S.C. § 922(t)(1); 27 C.F.R. § 478.102(a). If this provision is disregarded, firearms could be easily acquired by prohibited persons, such as felons, domestic abusers, minors, and persons who suffer from severe mental illness.

Allowing prohibited persons to have unfettered access to dangerous weapons is antithetical to what Congress envisioned. In prescribing who may purchase a firearm under the GCA, "Congress . . . sought broadly to keep firearms away from the persons Congress classified as potentially irresponsible and dangerous." *Barrett v. U.S.*, 423 U.S. 212, 218 (1976).

This adheres to a "longstanding" historical tradition of "prohibitions on the possession of firearms," such as limiting possession by "felons and the mentally ill." *Dist. of Columbia v. Heller*, 554 U.S. 570, 626–27 (2008); *see also United States v. Rahimi*, 602 U.S. 680, 698 (2024) (holding that, consistent with American history, individuals who pose a clear threat of physical violence may be denied access to firearms through a federal prohibition effected by the background check system); *Bruen*, 597 U.S. at 8-9 ("[T]he Second and Fourteenth Amendments protect the right of an ordinary, *law-abiding* citizen . . . ." (emphasis added)). The GCA honors this tradition by "establish[ing] a detailed scheme to enable the dealer to verify, at the point of sale, whether a potential buyer may lawfully own a gun." *Abramski*, 573 U.S. at 172.

So important is the identity of the purchaser that the following are all federal crimes: (1) FFLs selling a firearm without running a background check on the transferee, 18 U.S.C. § 922(t); (2) buyers making "any false or fictitious oral or written statement" concerning their identity, *id.* § 922(a)(6); and (3) FFLs making false statements in records regarding licensing or a buyer's identity, *id.* §§ 922(m), 924(a)(3).

### B. The Importance of Record-Keeping to Public Safety

To further aid law enforcement, the GCA also requires FFLs to engage in record-keeping central to tracking firearm transactions and inventory. *See* 18 U.S.C. § 923(g)(1)(A); 27 C.F.R. §§ 478.121–134. Law enforcement personnel are empowered to "inspect or examine the inventory and records of [FFLs] without such reasonable cause or warrant . . . in the course of a reasonable inquiry during the course of a criminal investigation." 18 U.S.C. § 923(g)(1)(B); *see also* 27 C.F.R. § 478.121(b).

These record-keeping provisions go far in helping law enforcement fight crime. *See Abramski*, 573 U.S. at 182 (information that FFLs are required to document and store "helps to fight serious crime"). For example, FFL record-keeping provisions requiring a firearm purchaser's address enables law enforcement to trace a firearm to the last bona fide purchaser and identify the firearm's path through the distribution chain. *See id.* Notably, over 60% of guns used in crime are purchased by individuals living within a ten-mile radius of the FFL where the firearm

was acquired.[11] And over 45% of purchasers are located within ten miles of the final possessor of the traced crime guns.[12] Without accurate records, which include important personal information about purchasers, law enforcement's ability to stop and solve gun-related crime would be undermined. *See J & G Sales Ltd. v. Truscott*, 473 F.3d 1043, 1045 (9th Cir. 2007) (ATF "relies upon FFL records when it seeks to trace a firearm at the behest of a law enforcement officer."); *United States v. Mobley*, 956 F.2d 450, 454 (3d Cir. 1992) (it is "no secret that a chain of custody for a firearm greatly assists in the difficult process of solving crimes.").

Consequently, courts routinely recognize that in the firearms context "'[i]mproper recordkeeping is a serious violation.'" *Fin & Feather Sport Shop, Inc. v. U.S. Treasury Dep't.*, 481 F. Supp. 800, 806 (D. Neb. 1979) (quoting *Huddleston*, 415 U.S. at 824). By failing to properly maintain required records, FFLs can "seriously undermine[] the effectiveness and purpose of the Act and ultimately endanger[] society."

---

[11] *Part III: Crime Guns Recovered and Traced Within the United States and Its Territories*, ATF: BUREAU OF ALCOHOL, TOBACCO, FIREARMS & EXPLOSIVES (March 27, 2024), https://www.atf.gov/firearms/docs/report/nfcta-volume-ii-part-iii-crime-guns-recovered-and-traced-us/download.

[12] *Id.*

*Id.* at 806; *Dick's Sport Ctr., Inc. v. Alexander*, 2006 WL 799178, at *5 (E.D. Mich. Mar. 29, 2006) (noting that licensee's "failure to comply with exacting bookkeeping regulations may hinder the ATF's ability to perform its mandated function").

## II. ATF's Enhanced Regulatory Enforcement Policy Aligns with the GCA and Applies Only to the Most Serious and Willful Violations

The enhanced regulatory enforcement policy at issue in this case targets only select, deliberate violations of law that directly imperil public safety.[13] ATF's corresponding guidance assists ATF personnel in conducting routine compliance inspections. App. 378-380; R. Doc. 34-1, at 2–3.

---

[13] *See Fact Sheet: Biden-Harris Administration Announces Comprehensive Strategy to Prevent and Respond to Gun Crime and Ensure Public Safety*, THE WHITE HOUSE (June 23, 2021), https://www.whitehouse.gov/briefing-room/statements-releases/2021/06/23/fact-sheet-biden-harris-administration-announces-comprehensive-strategy-to-prevent-and-respond-to-gun-crime-and-ensure-public-safety/; *Attorney General Merrick B. Garland Delivers Remarks on the Biden Administration's Gun Crime Prevention Strategy*, U.S. DEP'T. OF JUST. (June 23, 2021), https://www.justice.gov/opa/speech/attorney-general-merrick-b-garland-delivers-remarks-biden-administration-s-gun-crime?utm_medium=email&utm_source=govdelivery. *See also* ATF Order 5370.1F, App. 379, R. Doc. 34-1.

As noted, the AAP pinpoints a narrow subset of FFL violations for which license revocation should be the "assumed" recourse, albeit only upon a finding of willfulness. They are: "transferring a firearm to a prohibited person; failing to run a background check prior to transferring a firearm to a non-licensee; falsifying records, or making false statements; failing to respond to an ATF tracing request; refusing to permit ATF to conduct an inspection; or allowing a straw sale of a firearm to occur." App. 384; R. Doc. 34-1 at 6. These infractions warrant revocation precisely because they so evidently undermine public safety as well as ATF's ability to trace firearms involved in criminal activity.

Calling this suite of violations "good-faith, clerical, and ultimately harmless errors in FFL recordkeeping," App. 36; R. Doc. 1, at 8, ¶ 40, mischaracterizes the list entirely. Four of the five are about conduct, not record-keeping. Furnishing a gun to a "prohibited person" (18 U.S.C. § 922(t)(1)); choosing not to complete a background check; disregarding a tracing request; and denying an ATF inspector's entry are all intentional actions unrelated to paperwork. When the AAP finally turns to record-keeping, it centers on outright fraud—falsifying records required by a

federal agency, which is often cited in the context of covering up illegal sales.

Plaintiffs contend that the AAP has radically departed from previous guidance, which had vested discretion in ATF officers when determining whether FFLs were observing licensing rules. App. 40-41; R. Doc. 1, at 12–13, ¶¶ 53–61. Not so. The AAP continues to recognize that "each inspection has unique and sometimes complex circumstances" and, as before, provides a rubric for determining whether violations of the GCA are "willful." App. 380; R. Doc. 34-1, at 2–3 (outlining five questions "the field should consider . . . when recommending administrative action"). Contrary to Plaintiffs' further contention, the AAP mandates that ATF field officers, and not a "computer system," App. 44; R. Doc. 1, at 16, ¶ 73, assess whether FFLs are abiding by the GCA's background check and record-keeping requirements.

Trivializing the above-described violations ignores their potency in maintaining public safety and fighting crime. The willful doing of any of these five misdeeds undermines the essential purpose and public safety directive of the GCA to "curb crime by keeping 'firearms out of the hands

of those not legally entitled to possess them.'" *Huddleston,* 415 U.S. at 824 (quoting S. Rep. No. 90-1501 (1968)).

## III. The Data Demonstrate the Enhanced Regulatory Enforcement Policy's Modest Yet Important Nature

Claims that the AAP dramatically transforms ATF revocation practices are belied by the facts. Since the establishment of the enhanced regulatory enforcement policy, revocations of licenses remain extraordinarily rare. In FY 2023, for instance, ATF conducted 8,689 compliance inspections, with 4,045 of them resulting in some form of administrative action.[14] A revocation was recommended in only 170 of those compliance inspections. *Id.* This means that, in FY 2023, ATF issued a revocation order to less than .2% of all FFLs in the U.S., *id.* (identifying 132,383 active FFLs in 2023), and in less than 2% of inspections. And, of all cases resulting in some kind of administrative action, ATF revoked licenses in only 4.2% of them—down from 11% in 2004 and 6% in 2005, for example. *See id.*; *see also Review of ATF's Federal Firearms License Inspection Program* (April 2013),

[14] *See Fact Sheet – Facts and Figures for Fiscal Year 2023*, ATF: Bureau of Alcohol, Tobacco, Firearms & Explosives (July 2024), https://www.atf.gov/resource-center/fact-sheet/fact-sheet-facts-and-figures-fiscal-year-2023.

https://oig.justice.gov/reports/2013/e1305.pdf. In each of those cases, FFLs were all afforded the opportunity to challenge the revocation through an extensive process. And recall that these revocable violations were not for innocent mistakes or accidents but alleged willful defiance of law.

Ultimately, when revocation does in fact occur, the fact patterns are sobering and dire, such as the case of Charles Brown (d/b/a Uncle Sam's Loan Office in Bristol, Tennessee). The ATF revoked Mr. Brown's license in July 2022. The revocation was after a full hearing, and only after finding that he willfully violated the law *even after* the ATF repeatedly tried to educate, instruct, and impress upon Mr. Brown the importance of compliance and accurate record-keeping.[15] Other revocations are to similar effect, bespeaking flagrant defiance of safety measures.[16]

---

[15] *Final Notice of Denial of Application, Revocation, Suspension and/or Fine of Firearms License for Licensee Charles G. Brown*, ATF Bureau of Alcohol, Tobacco, Firearms & Explosives (July 21, 2022), https://www.atf.gov/docs/undefined/charlesgbrowninc62fci-8343508pdf/download.

[16] *See Final Notice of Denial of Application, Revocation, Suspension and/or Fine of Firearms License for Licensee Blue Valley Sales, Inc. d/b/a Blue Valley Firearms,* ATF, (Feb. 3, 2022), *https://www.atf.gov/docs/undefined/bluevalleysalesinc14fci-21646r1508pdf/download* (revoking where FFL willfully falsified (Continued…)

## IV. Federal Firearm Licensees Enjoy Special Protections to Challenge a Potential Revocation

Generally, and with certain exceptions, the AAP lays out three possible scenarios (other than taking no action) for violations found during inspection of an FFL: (i) a warning letter, (ii) a warning conference, and (iii) revocation pursuant to 18 U.S.C. § 923(e).

In the exceedingly rare instance when ATF does pursue license revocation, it is not done summarily or carelessly. Rather, FFLs facing revocation are afforded a robust set of protections before revocation takes effect. *See* 27 C.F.R. §§ 478.73–74. First comes notice: ATF sends the FFL

---

firearms records); *see also Final Notice of Denial of Application, Revocation, Suspension and/or Fine of Firearms License for Licensee Gary William Gibbs d/b/a The Gun Shop*, ATF (May 20, 2022), https://www.atf.gov/docs/undefined/garywilliamgibbs84fci-24948508pdf/download (revoking where FFL failed to perform background check before transferring firearm to an unlicensed person on twelve occasions); *Final Notice of Denial of Application, Revocation, Suspension and/or Fine of Firearms License for Licensee Harrison's Inc. d/b/a LaVergne Pawn and Jewelry*, ATF (July 21, 2022), https://www.atf.gov/docs/undefined/harrisonsinc82fci-24993508pdf/download (same); *Final Notice of Denial of Application, Revocation, Suspension and/or Fine of Firearms License for Licensee Blue Water Sales, LLC* (July 27, 2022), https://www/atf/gov/file/177626/download (revoking where FFL transferred firearm to brother-in-law without conducting a background check, without obtaining the required ATF forms, and falsifying the acquisition and disposition record *only four days after* an ATF inspection advising FFL of GCA requirements and past violations).

a notice of revocation that specifies the violations forming the bases for the pursued revocation and notifies the licensee of its right to request a hearing prior to suspension or revocation. *Id.*; *see also* 18 U.S.C. § 923(f)(2). The FFL may then request a hearing with the ATF Director of Industry Operations (DIO). At that hearing, the FFL is provided full opportunity to retain an attorney, challenge the asserted violations by submitting evidence and arguments, and cross-examine witnesses. The FFL may also bring employees and documentation to address the violations cited. *See* 18 U.S.C. §§ 923(e) and (f)(3); 27 C.F.R. §§ 478.73 and 478.74.

Then, at the hearing, the government still must carry its burden by proving a willful violation of federal firearms law. Not negligence, not clerical error, not accident, not an innocent mishap: a *willful* violation. To do so, the government must establish that a licensee "knew of his legal obligation and purposefully disregarded or was plainly indifferent" to it. *Lewin v. Blumenthal*, 590 F.2d 268, 269 (8th Cir. 1979) (referencing the record-keeping requirements of Section 923(g)); *see also On Target Sporting Goods, Inc. v. Att'y Gen. of U.S.*, 472 F.3d 572, 575 (8th Cir. 2007) ("For the government to prove a willful violation of the federal

firearms statutes, it need [] establish that a licensee knew of its legal obligation and purposefully disregarded or was plainly indifferent to the record-keeping requirements." (internal quotations omitted)). Notably, until the government successfully proves its case, the license remains in effect and the FFL can continue operating pending the outcome of the hearing. 27 C.F.R. § 478.78.

If, after all this process, the DIO ultimately determines that the cited violations were willful and revocation is justified, or if the FFL does not request a hearing, still more process ensues. ATF next sends a final notice of revocation to the licensee featuring a summary of the findings and legal conclusions that warrant revocation. *See Revocation of Firearms Licenses*, ATF: BUREAU OF ALCOHOL, TOBACCO, FIREARMS & EXPLOSIVES, https://www.atf.gov/firearms/revocation-firearms-licenses (last visited Jan. 19, 2025). The FFL may then appeal by filing a petition for judicial review, which triggers a *de novo* review of the matter, affording no deference to ATF. *See* 18 U.S.C. § 923(f)(3). Indeed, as the District Court here explained when denying Plaintiffs' motion for a preliminary injunction: "FFLs are entitled to district court review of a revocation of their license, a process familiar to both FFLs and courts."

*Morehouse Enterprises, LLC v. Bureau of Alcohol, Tobacco, Firearms and Explosives*, 2024 WL 708954, at *5 (D.N.D. Jan. 2, 2024). Moreover, the FFL may even introduce new evidence in support of its appeal. *See* 18 U.S.C. § 923(f)(3).

Put simply, these stout protections—which ripple through the revocation process—amply protect FFLs' interests in those rare instances when revocation occurs.

## CONCLUSION

Congress's animating concern in enacting the GCA was "the practical realities . . . of firearm transactions." *Abramski*, 573 U.S. at 183. The reality is that practical measures—background checks, inspections, gun tracing procedures, and common-sense record-keeping—keep guns out of the wrong hands and save lives. Willful defiance of these mechanisms should enjoy no tolerance. The regulatory enforcement policy is well within the ATF's enforcement authority and promotes the ATF's duty to faithfully execute the laws for the nation's well-being.

For these reasons, and those set forth in the government's submission, Plaintiffs-Appellants' challenge to the policy should fail, and the Court should affirm dismissal of the complaint.

Date:January 21, 2025

*/s/Scott L. Winkelman*
Scott L. Winkelman
Tiana L. Russell
Julia Carbonetti
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C. 20004-2595
Phone: (202) 624-2500
Fax: (202) 628-5116
swinkelman@crowell.com
trussell@crowell.com
jcarbonetti@crowell.com

Luke Taeschler
Suzanne Giammalva
CROWELL & MORING LLP
375 Ninth Avenue
New York, NY 10001
Phone: (212) 223-4000
ltaeschler@crowell.com
sgiammalva@crowell.com

*Counsel for Amici Curiae*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation contained in Fed. R. App. P. 29(a)(5) and 32(a)(7)(B) because, excluding the portions exempted by Rule 32(f), this brief contains 4743 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2019 in 14-point Century Schoolbook.

Pursuant to Circuit Rule 28A(h), the brief has been scanned for viruses and is virus-free.

*/s/ Scott L. Winkelman*
Scott L. Winkelman

## CERTIFICATE OF SERVICE

I certify that on January 21, 2025, I electronically filed the foregoing brief with the Clerk of Court for the U.S. Court of Appeals for the Eighth Circuit through the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

*/s/ Scott L. Winkelman*
Scott L. Winkelman